IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE JUBILEE-MILLER, | : | CIVIL ACTION |
| | : | NO. 09-00749 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FRANKFORD TORRESDALE HOSPITAL, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                             FEBRUARY 14, 2011

**I.    INTRODUCTION**

This case arises under Title VII, 42 U.S.C. § 2000e-2(a)(2), and the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. § 951. Plaintiff Michelle Jubilee-Miller ("Plaintiff") brings this cause of action against Defendant Frankford Torresdale Hospital, whose correct name is now ARIA Health ("Defendant"). Plaintiff alleges that she was terminated from her employment at Defendant's Frankford/Torres Hospital due to race discrimination. (Compl. ¶¶ 36-48.)

## II. BACKGROUND[1]

    A.   <u>Plaintiff's Work Performance Prior to the March 23, 2007 Incident</u>

Defendant is a healthcare provider to patients throughout the Frankford and Northeast sections of Philadelphia and in Bucks County, Pennsylvania. Aria Health, http://www.ariahealth.org/default.aspx?pageid=2930 (last visited Jan. 7, 2011). Plaintiff began working as a Certified Nurse Assistant ("CNA") at Defendant's Frankford/Torres Hospital on or about November 14, 2005. (Compl. ¶ 11.) Plaintiff was hired by Nursing Manager Deborah Wiese ("Wiese"). (Pl.'s Dep. 120, Dec. 21, 2009.) Wiese was Plaintiff's unit supervisor and the person Plaintiff reported to. (<u>Id.</u> at 50.) Plaintiff usually worked the overnight shift at the Frankford/Torres Hospital. (<u>Id.</u> at 40, 47-48, 173.) Plaintiff was assigned to patients in the Telemetry Department in Unit 2A. (<u>Id.</u> at 47-48.) Because the patients in Unit 2A need continuous monitoring, Plaintiff was required to inform the Registered Nurses ("RNs") on duty any time she took a break or otherwise left the patient care area. (<u>Id.</u> at 52-53.) Plaintiff had to wear a personal locator so that the staff could easily locate her if necessary. (<u>Id.</u> at 240-41.) Hourly employees were required to record the time that they left and returned to

---

[1] The Court accepts, as true, all well pleaded allegations in the complaint and views them in the light most favorable to plaintiff.

work if they left for non-work related reasons. (Employee Handbook, Def.'s Ex. B. at DEF028.)

Plaintiff's first performance review is dated March 10, 2006. (Jubilee-Miller 3 Month Performance Review, Def.'s Ex. F.) The March 10, 2006 review is very positive and states that Plaintiff, "demonstrated the Knowledge, Skills, Ability, and Performance needed to pass the Introductory Employment Period." (Id.)

Plaintiff's next performance review is dated June 15, 2006. (Jubilee-Miller Employee Performance Review 2006, Def.'s Ex. G.) The June 15, 2006 review states that Plaintiff, "is attentive to detail and accuracy, committed to excellence, looks for improvements continuously, monitors quality levels, owns/act on quality problems." (Id. at 3.) The review also states that Plaintiff "can be relied on to complete her assignments" and that she exceeds expectations for customer focus/service. (Id. at 1, 3.) Overall, Plaintiff received a rating of 3.51 out of 5.0. (Id. at 6.) Plaintiff was evaluated as exceeding expectations in eight (8) areas and meeting expectations in nine (9) areas. (Id.)

On August 11, 2006, Plaintiff was written up for lateness and for calling out on several occasions. On February 2, 2007, Plaintiff received a final warning for taking breaks without informing other staff members of where she was going and for leaving her personal locator at one of the computers so that

it registered that she was in the unit. Plaintiff testified that others were allowed to leave the unit without permission and were not reprimanded. (Pl.'s Dep. at 97.) Plaintiff testified that she did not know whether other employees had permission to leave the building for breaks. (Id. at 301, 325.) However, she testified that the policy of requiring employees to clock in and out was not applied to all staff members. (Id. at 302.) Plaintiff testified that the February 2, 2007 final warning was her first write-up. (Id. at 92-93.) Later, she acknowledged that she was written up about attendance in 2006, but stated that she did not know, at the time of the write-ups, that she was being written up. (Id.)

Plaintiff further testified that she never left the unit without alerting the nursing staff. (Id. at 89.) Plaintiff testified that she left the unit to go to Dunkin Donuts without clocking out only because other staff members told her that she did not have to clock out. (Id. at 90, 302.) Plaintiff stated that Wiese told her that she (Wiese) knew that other staff members went to Wawa or Dunkin Donuts, but that the policy required staff members to clock out. (Id. at 97.) Plaintiff responded, "[w]ell, if you are going to write me up for policy, then you should write everybody else up too because they left the building and did not clock in or out." (Id.) Wiese then told the Plaintiff, "I am not talking about anybody else, I am talking to

you," and then said, "[o]ne more writeup, sister, and you are out the door." (Id. at 97-98.)

  B.  The March 23, 2007 Incident

On March 22-23, 2007, Plaintiff worked the overnight shift from approximately 7:00 p.m. until 7:30 a.m. (Id. at 11-12.) From 11:00 p.m. until 7:00 a.m., there were two CNAS assigned to Unit 2A. (Id. at 48.) The two CNAs divided the patients in Unit 2A between themselves and did not work with the same patients. (Id.) On March 23, 2007, Plaintiff was responsible for a patient who had several episodes of explosive diarrhea. (Id. at 13.) Plaintiff, alongside the RN, was responsible for cleaning the patient. (Id. at 14.) The patient had episodes of explosive diarrhea "more than twice" and "on at least five or six occasions" during Plaintiff's shift. (Id. at 14, 30.)

Plaintiff testified that the patient was considered to be able to basically care for himself, but that he tried to go to the toilet himself and fell. (Id. at 14.) As a result, there was blood and feces on the floor. (Id.) Plaintiff, with the assistance of the RNs, put "blue chucks" (mats) on the floor at around 4:00 or 5:00 a.m. and at around 6:30 a.m. (Id. at 15.) Plaintiff and the RNs, including Paula Durkalac, Michael Gregorie, Pam Hueber, and "Maryanna," cleaned the blue chucks several times. (Id. at 15, 19-20.) Plaintiff testified that she and the RNs cleaned the patient more than one time and that she

last remembered cleaning the patient right before the end of her shift at around 6:30 or 7:00 a.m. (Id. at 21-22.) Plaintiff testified that she "probably" went back to check on the patient at around 7:00 a.m. and that he was clean at that time. (Id. at 22.) At that time, there was just one blue chuck, which was clean, left in the bathroom as a mat. (Id. at 23.) From 7:00 a.m. until 7:30 a.m., Plaintiff was preparing to report to the CNA who was relieving her. (Id. at 41-42.) On that same day, March 23, 2007, Plaintiff took leave for surgery with permission pursuant to the Family Medical Leave Act. (Id. at 12.)

Plaintiff testified that she kept in contact with Wiese to let her know how she was recovering from surgery. (Id. at 57-58.) Plaintiff testified that when she spoke with Wiese on the phone in August, Wiese said that "she couldn't wait for me to come back to work but we had to go over my schedule, and that's what she called me in for." (Id. at 58.) On August 6, 2007, Plaintiff returned from medical leave and met with Wiese. (Pl.'s Reply Br. at 4; Pl.'s Dep. at 60.) Plaintiff testified that Wiese read off writeups for inappropriate contact with a patient and for neglect. (Pl.'s Dep. at p. 60.) Plaintiff recalled receiving prior writeups for attendance problems in 2006 and for taking unauthorized breaks in 2007. (Id. at 61.) Plaintiff stated that she signed the 2006 and 2007 writeups at the time she received them, but that she did not read them. (Id. at 62.) At the August

6, 2007 meeting, Plaintiff explained what happened with the patient on March 23, 2007 and stated that she would never leave a patient covered in feces. (Id. at 64.) Plaintiff agreed that leaving a patient in such a state was abuse and that if she had left a patient like that, she deserved to be fired. (Id. at 67.) Plaintiff believed that Wiese made the decision to fire her because of her race. (Id. at 89.)

On August 6, 2007, Wiese completed a Performance Improvement Corrective Action form. (Pl.'s Ex. D., doc. no. 22-1.) The Performance Improvement Corrective Action form states that Plaintiff had attendance/lateness issues on several dates, including 9/16/06, 10/21/06, 10/27/06, 12/25/06, 1/7/07, and 8/11/06. (Id. at DEF448.) Wiese indicated that Plaintiff relied on others for solutions in problems that arise in her work and that "has left patients in unsafe conditions. . . ." (Id. at DEF449.) For work environment/safety, Wiese commented that, "Michelle pays little attention to her work environment. She often ignores potentially hazardous situations, assuming others will take responsibility for a safe workplace. Michelle must immediately begin to take responsibility for keeping the workplace safe, clean, uncluttered, and free of hazards." (Id. at DEF450.) Plaintiff received an overall rating of 1.96 out of 5.0. (Id. at DEF452.) The Performance Improvement Corrective Action form states as the consequence for Plaintiff failing to come to

work on time that "further progression [was] in progress." (Id.) Plaintiff signed this form indicating that she had received written counseling for her attendance/lateness issues. (Id.)

On August 6, 2007, Plaintiff also received a Performance Improvement Corrective Action form discharging her employment. (Def.'s Ex. K at DEF155.) Plaintiff refused to sign this form indicating that she wanted to have a hearing and/or meeting because the subject of her termination was only brought to her attention on August 6, 2007 and not at the time it allegedly occurred. (Id.) Attached to the Performance Improvement Corrective Action form was Wiese's account of the events that occurred on March 23, 2007. (Id. at DEF156.) Wiese wrote that when she arrived at the unit at 7:45 a.m. on March 23, 2007, "[t]he smell of feces was very overwhelming." She was told that Plaintiff failed to clean a patient after he had an episode of massive explosive diarrhea and that as a result, the patient fell. The report indicates that Plaintiff bathed the patient at 4:00 a.m., but failed to clean the patient when he had another episode at 6:30 a.m. The dayshift CNA informed Wiese that when she arrived, the patient was covered in dried feces. A housekeeper was called to the room and spent 1-2 hours cleaning the mess.

Based on Plaintiff's termination, she has brought this suit for race discrimination.

**III. DISCUSSION**

Plaintiff has filed a cause of action pursuant to Title VII and PHRA, alleging that Defendant engaged in race discrimination. Defendant has moved for summary judgment.

A. <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

"After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material

fact, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

    B.    <u>Legal Standard to Establish Race Discrimination pursuant to Title VII and PHRA</u>

With respect to Plaintiff's race discrimination claim, the United States Court of Appeals for the Third Circuit applies a "modified burden shifting analysis."[2] An employer who discriminates does not typically announce a discriminatory animus; therefore, the United States Supreme Court created a modified burden shifting analysis to allow plaintiffs to bring discrimination claims even though they lack direct proof of discrimination. See <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 157 (3d Cir. 1999) (discussing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). Under this analysis, each plaintiff carries the

---

[2] The same analysis is applicable to claims brought under 42 U.S.C. § 1981, Title VII, and PHRA. <u>Pamintuan v. Nanticoke Mem'l Hosp.</u>, 192 F.3d 378, 385 (3d Cir. 1999) ("We analyze section 1981 claims under the familiar <u>McDonnell Douglas</u> shifting burden framework used in Title VII discrimination case."); <u>Coulton v. Univ. of Penn.</u>, 237 F. App.'x 741, 747 (3d Cir. 2007) (applying <u>McDonnell Douglas</u> framework to § 1981 and PHRA claims); <u>Gomez v. Allegheny Health Servs., Inc.</u>, 71 F.3d 1079, 1084 (3d Cir. 1995) ("The state Act is construed consistently with interpretations of Title VII.").

initial burden and must establish a prima facie case of race discrimination by a preponderance of the evidence. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2009). Once the prima facie case is established, "the burden [of production] shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Id. (quoting McDonnell, 411 U.S. at 802). If the employer meets this burden, the presumption of discrimination raised by plaintiff's prima facie case is rebutted, and "[t]he plaintiff must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination." Id.

1. The Prima Facie Case

Whether a plaintiff has established a prima facie case is a question of law. Id. Establishing a prima facie case requires the plaintiff to show that: "(1) [he/she] belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) [this occurred] under circumstances that raise an inference of discriminatory action . . . ." Id.

In this case, Plaintiff alleges that she is in a protected class because she is African American. (Pl.'s Resp. at 15.) Second, Plaintiff alleges that she was qualified for her position because her 2006 performance evaluations were positive and she was given a 3.51 rating out of 5.0 in her June 15, 2006

performance evaluation. (Id.) Third, Plaintiff has demonstrated that she was subject to an adverse action because she was terminated on August 7, 2007. (Id.) As for the final element of the prima facie case, Plaintiff must demonstrate, by a preponderance of the evidence, that she was terminated based on her race.

Plaintiff argues that she was treated differently than other similarly situated white employees. (Id. at 7.) Catherine Lendzinski, a white female CNA, would often refuse to take patients' vital signs and was found to have falsified documents, but she was not immediately terminated. (Compl. ¶¶ 25 & 26.) Plaintiff asserts that other white female employees were allowed to leave the building for smoke breaks and to go buy donuts. Plaintiff was written up for leaving the building to go to Dunkin Donuts, while these other white female employees were not reprimanded. (Id. ¶¶ 27 & 28; Pl.'s Dep. at 97-98.) Plaintiff testified that Karen Snellbaker, one of the RNs, and other staff members harassed her. (Pl.'s Dep. at 101.) Karen Snellbaker and other staff members would antagonize Plaintiff asking, "who wants to go to Dunkin Donuts?" when they knew that Plaintiff was not permitted to go. (Id. at 103.) Karen Snellbaker would report that she had looked all over the unit and could not find the Plaintiff when that was not true. (Id.) Plaintiff recalled one incident when there was an unpleasant odor in the

hallway and Pam Hueber stated, "[y]ou know, that might be Michelle." (Id. at 150.) None of these people had supervisory authority over Plaintiff. (Id. at 153.) Plaintiff reported this conduct to Wiese, who told Plaintiff to "chalk it up as them being rude." (Id.) Plaintiff did not contact anyone in Human Resources about these matters. (Id. at 106-07.)

Plaintiff testified that Jen Clemmons, the unit secretary, engaged in race discrimination towards Plaintiff because Jen Clemmons pulled Plaintiff to go to other units more frequently than other white CNAs. (Id. at 111-12.) However, on one of these occasions, when Plaintiff informed Jen Clemmons that Plaintiff had just been pulled, Jen Clemmons sent a white CNA to the other unit instead of Plaintiff. (Id. at 113-14.) Neither Karen Snellbaker nor Jen Clemmons were involved in disciplining Plaintiff and neither evaluated her other than through peer evaluations. (Id. at 119-20.)

Plaintiff supports all of her allegations with her own deposition and with her 2006 favorable performance evaluations. Most of Plaintiff's arguments are adequately disputed by Defendant, but there are some facts of record (i.e., the real reason that Plaintiff was not allowed to take unauthorized breaks when other white employees were) which lead to the inference of favoritism towards white employees. As such, Plaintiff has established a prima facie case of race discrimination.

### 2. Legitimate, Nondiscriminatory Reason

Once a plaintiff establishes a prima facie case, a presumption of discrimination arises. This presumption can be rebutted if the employer "articulate[s] some legitimate, nondiscriminatory reason for the employee's [termination]." McDonnell, 411 U.S. at 802. This is a low standard, and "the Defendant need not persuade the court that it was actually motivated by the proffered reasons." Iadimarco, 190 F.3d at 157 (internal citations omitted). "The defendant satisfies its burden [of production] at this step by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 271 (3d Cir. 2010) (internal citations omitted).

Here, Defendant offers adequate nondiscriminatory reasons as to why Plaintiff was terminated, that is that Plaintiff left a patient covered in feces. Wiese's memorialized account of the March 23, 2007 incident clearly shows that Wiese believed that Plaintiff had left a patient covered in feces. Plaintiff agrees that if she did in fact leave a patient in this state, she deserved to be fired. (Pl.'s Dep. at 67.) Based on the aforementioned, it was not discrimination but rather Defendant's good faith belief that Plaintiff left a patient covered in feces that resulted in Plaintiff's termination.

Based on the foregoing, Defendant has provided a legitimate, nondiscriminatory reason for Plaintiff's termination and has adequately sustained its burden of production.

         3.   <u>Pretext</u>

After a defendant offers a legitimate, nondiscriminatory reason for termination, to defeat summary judgment, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating . . . cause of the employer's action." <u>Iadimarco</u>, 190 F.3d at 165-66. In other words, the plaintiff must provide evidence to "allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons [were] either a post hoc fabrication or otherwise did not actually motivate the employment action." <u>Id.</u> at 166 (internal citations omitted). It is not enough for the plaintiff to show that the employer's decision was "wrong or mistaken." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (citing <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 531, 533 (3d Cir. 1992) (other internal citations omitted)). Rather, the plaintiff must show inconsistencies or implausibilities in the employer's proffered legitimate, nondiscriminatory reason which would lead a jury to believe that the employer was not in fact motivated by

the alleged legitimate, nondiscriminatory reason. Fuentes, 32 F.3d at 765 (citing Ezold, 983 F.2d at 531).

Plaintiff alleges that Defendant's legitimate, nondiscriminatory reason is a pretext, and supports this assertion with evidence that Catherine Lendzinski, a white female CNA, would often refuse to take patients' vital signs and was found to have falsified documents, but was not immediately terminated. (Compl. ¶¶ 25 & 26.) Defendant has presented evidence that Catherine Lendzinski was in fact terminated on July 18, 2007 for falsification of vital signs on two different patients and for "failure to care for patients according to standards of care." (Lendzinski Performance Improvement Corrective Action Form, Def.'s Ex. N.)[3] Plaintiff's use of Catherine Lendzinski as a comparator does not support Plaintiff's case since Catherine Lendzinski was terminated for the conduct that Plaintiff complained of, falsification of documents. Plaintiff argues that Catherine Lendzinski was treated more favorably than Plaintiff in that Catherine Lendzinski was not immediately terminated. This argument also does not support Plaintiff's case since Plaintiff

---

[3] In Defendant's Motion for Summary Judgment and Reply Brief, Defendant asserts that Catherine Lendzinski was terminated for leaving a patient "laying in BM" on "a urine soaked bed from his waist down." (Def.'s Mot. Summ. J. at 15-16 (citing Exhibit M).) Exhibit M merely states that Catherine Lendzinski was terminated for "failure to care for patients according to standards of care." There is no evidence on the record that Catherine Lendzinski was terminated for leaving a patient on a urine soaked bed.

-16-

was not immediately terminated after the March 23, 2007 incident, but rather was terminated when she returned from medical leave on August 6, 2007. Plaintiff has essentially shown that she was treated very similarly to Catherine Lendzinski, a white female CNA, who was terminated for falsification of documents and for failing to properly care for patients.

Plaintiff's only other comparators are the other white female CNAs, who were not reprimanded for leaving the building and unit, while Plaintiff was reprimanded for the same conduct. Plaintiff testified that she was did not know whether these white female employees had permission to leave the building. (Pl.'s Dep. at 301, 325.) Plaintiff argues that the fact that she was pulled to go to other units more frequently than other white female CNAs shows that Defendant's proffered legitimate, nondiscriminatory reason is pretextual; however, Plaintiff testified that when she told Jen Clemmons that she had just been pulled, a white CNA was sent in her place. Moreover, the issues of Plaintiff allegedly taking unauthorized breaks or being pulled more frequently than other employees are irrelevant to this lawsuit since the reason for Plaintiff's termination was that she left a patient covered in feces.

In support of Plaintiff's argument that Defendant's proffered legitimate, nondiscriminatory reason is pretextual, Plaintiff also points to the fact that she was not terminated

until August 6, 2007 despite the fact that the conduct giving rise to her termination occurred on March 23, 2007. This argument is unavailing since Plaintiff was on medical leave during this time. No inference of discrimination can be made from the fact that Plaintiff was not terminated until she came back from medical leave in August. In addition, Wiese's statement, "[o]ne more write-up, sister, and you are out the door," does not give rise to an inference of discrimination. (Pl.'s Dep. at 98.) Nor is there any evidence that Pam Hueber's statement, that an unpleasant odor may have been caused by Plaintiff, was motivated by racial discrimination. See Pollard v. George S. Coyne Chemical Co., No. 07-3744, 2008 WL 2120710, at *6 (E.D. Pa. May 19, 2008) (finding that no inference of racial discrimination is made, where the plaintiff offers no evidence, other than his own suspicion, that comments are motivated by race (citing Billet v. CIGNA Corp., 940 F.2d 812, 816 (3d Cir. 1991)).

Plaintiff alleges that the fact that Wiese evaluated her positively up until June 2006, and then abruptly, her evaluations became very negative raises an inference of discrimination. Plaintiff's reliance on past performance reviews in order to discredit Defendant's proffered legitimate, nondiscriminatory reason is ineffectual as the United States Court of Appeals for the Third Circuit has held that, "[t]he attempt to use past positive performance reviews to show that

-18-

more recent criticism was pretextual fails as a matter of law." Kautz v. Met-Pro Corp., 412 F.3d 463, 474 (3d Cir. 2005) (citing Ezold, 983 F.2d at 528). Also, the fact that Wiese changed Plaintiff's schedule on one occasion does not show that Defendant's legitimate, nondiscriminatory reason is a pretext, since Plaintiff also testified that Wiese tried to accommodate Plaintiff's schedule so that Plaintiff could work two jobs and look after her children. (Pl.'s Dep. at 125-29).

Overall, Plaintiff fails to establish via record evidence that Defendant's legitimate, nondiscriminatory reason is a pretext.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted. An appropriate order will follow.

_____